NIEMEYER, Circuit Judge,
dissenting:
When offering legislative prayers in which the Divine Being is publicly asked for guidance and a blessing of the legislators, religious leaders will hereafter have to refrain from referencing the Divine Being with the inspired or revealed name, according to each leader’s religion. The majority’s decree commands that every legislative prayer reference only “God” or *356 some “nonsectarian ideal,” supposedly because other appellations might offend. Thus, in a stated sensitivity to references that might identify the religion practiced by the religious leader, the majority has dared to step in and regulate the language of prayer — the sacred dialogue between humankind and God. Such a decision treats prayer agnostically; reduces it to civil nicety; hardly accommodates the Supreme Court’s jurisprudence in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); and creates a circuit split, see Pelphrey v. Cobb County, Ga., 547 F.3d 1263 (11th Cir.2008) (finding constitutional legislative prayers offered by “volunteer leaders of different religions, on a rotating basis,” even though the prayers referenced Jesus; Allah; the God of Abraham, Isaac, and Jacob; Mohammed; and Heavenly Father). Most frightfully, it will require secular legislative and judicial bodies to evaluate and parse particular religious prayers under an array of criteria identified by the majority.
It is the policy of the Board of Commissioners of Forsyth County, North Carolina, to invite religious leaders from the various congregations in the County, “on a first-come, first-serve basis,” to offer a prayer before the beginning of its twice-monthly meetings, “for the benefit and blessing of the Board.” The Board allows the religious leaders to determine the content of the prayer except that it “requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.” Under this denominationally neutral and proactively inclusive policy, prayers from a broad array of religions and denominations have been offered, although most — reflecting the County’s demographics and the responses of its religious leaders' — have been offered by leaders of Christian denominations.
Janet Joyner and Constance Blackmon commenced this action to declare these prayers unconstitutional and to enjoin their continuation because the prayers offered have been mostly Christian and have often invoked the name of Jesus. Joyner and Blackmon allege in their complaint that they are “offended by the sectarian prayers because the prayers are an unconstitutional endorsement of a particular religion and an improper attempt by the county government to prefer one religious faith over others.”
The district court granted summary judgment to Joyner and Blackmon, concluding that, because of the frequency of Christian prayers, “the invocation Policy, as implemented, has resulted in Government-sponsored prayers that have advance[d] a specific faith or belief and have the effect of affiliating the government with that particular faith or belief,” ie., Christianity.
I would reverse this judgment. Because Forsyth County has established a completely neutral policy of allowing all and any religious leaders to deliver invocational prayers of their own composition before Board meetings and has sought proactively to be inclusive, I would conclude that the prayers do not violate the Establishment Clause. The Establishment Clause does not require the County to forbid invocational speakers from making sectarian references in their prayers. Rather, the County’s policy of pluralistic inclusion complies with the Establishment Clause and more particularly the Supreme Court’s opinion in Marsh, which approved legislative prayers as constitutional so long as the government does not proselytize, advance one religion or faith over another, or disparage any other religion or faith. Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330.
*357 I
The Forsyth County Board of Commissioners has allowed religious invocations before its meetings since 1979, and in May 2007, it adopted a written policy that codified, but did not change, its practice.
The policy expresses the Board’s desire “to solemnize [Board] proceedings” but provides that “[n]o member or employee of the Board or any other person in attendance at the meeting shall be required to participate in any prayer that is offered.” The policy states that “[t]he prayer shall be voluntarily delivered by an eligible member of the elergy/religious leader in Forsyth County,” and, “[t]o ensure that such person (the “invocational speaker”) is selected from among a wide pool of the County’s elergy/religious leaders,” the Clerk of the Board sends an invitation to the religious leader of every congregation with a presence in the County, asking if the religious leader would like to deliver an invocational prayer at a Board meeting. The invitation reads in relevant part:
The Forsyth County Board of Commissioners makes it a policy to invite members of the elergy/religious leaders in Forsyth County to voluntarily offer a prayer before the beginning of its meetings, for the benefit and blessing of the Board.
This opportunity is voluntary, and you are free to offer the invocation according to the dictates of yoxxr own conscience. To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.
Religious leaders responding to the invitation are scheduled “on a first-come, first-serve basis” to deliver the prayer, and no religious leader receives compensation for the service. Moreover, the Board has charged the Clerk of the Board with making every reasonable effort “to ensure that a variety of eligible invocational speakers are scheduled for the Board meetings.” To this end, the policy provides that “[i]n any event, no invocational speaker shall be scheduled to offer a prayer at consecutive meetings of the Board, or at more than two (2) Board meetings in any calendar year.”
The policy states that the Board will exercise no editorial control over invocational prayers and that “[n]either the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker.”
The list that the Clerk compiled of religious leaders responding to the Clerk’s invitation is lengthy and includes a broad array of religions and denominations. While the majority on the list are identifiably Christian, including large Christian denominations, such as Methodists, Baptists, Presbyterians, Greek Orthodox, Catholics, Episcopalians, and Lutherans, it also includes other smaller Christian denominations and non-Christian religions, such as Moravian, “nondenominational,” Universalist, Deliverance, Apostolic, Disciples of Christ, Church of Christ, Ba’hai Faith, Holiness, Wesleyan, Interdenominational, Islamic, Jewish, Mormon, Seventh Day Adventist, Assembly of God, Nazarene, Pentecostal, Friends/Quaker, and Jehovah’s Witness.
The prayers that have been offered by the responding religious leaders have generally asked for Divine guidance and the blessing of the Board, usually appealing to “God” or “Father.” A number of the *358 Christian prayers also ended by invoking the name of Jesus.
The American Civil Liberties Union of North Carolina Legal Foundation (“ACLU”) wrote a letter to the Board in October 2006 “recommending] that [the Board] adopt a policy to ensure that Forsyth County Board of Commissioners meetings are not being opened with sectarian invocations.” When the Board, in response to the admonition, affirmed its policy of opening its meetings with invocations by religious leaders under the neutral and inclusive policy that it had followed since 1979, Janet Joyner and Constance Blackmon commenced this action against the Board.
In their complaint, Joyner and Blackmon complain of “at least 16 sectarian (Christian) prayers” delivered at meetings during the course of the year from January 2006 through February 2007, as well as a prayer given on December 17, 2007. Most of the challenged prayers, which are set forth in the complaint, asked God to guide and bless the Commissioners and invoked Jesus’ name at the conclusion. Joyner and Blackmon alleged that these sectarian prayers “offended” them because they constituted “an unconstitutional endorsement of a particular religion and an improper attempt by the county government to prefer one religious faith over others.”
On cross-motions for summary judgment, the magistrate judge concluded that the prayers presented at the beginning of meetings of the Board of Commissioners could not, “as a whole,” be considered “nonsectarian or civil prayer.” The magistrate judge concluded that the prayers displayed “a preference for Christianity over other religions by the government. The frequent references to Jesus Christ cause the prayers to promote one religion over all others, and thus the effect of these prayers is to affiliate the Board with a specific faith or belief.” The magistrate judge recommended that Joyner and Blackmon’s motion for summary judgment be granted and that Forsyth County’s motion for summary judgment be denied.
The district judge agreed and signed an order, dated January 28, 2010, declaring that the invocation policy, “as implemented,” violated the Establishment Clause and enjoining the Board from “continuing the Policy as it is now implemented.”
The majority affirms this judgment. In doing so, it does not prohibit legislative prayer, nor does it find the policy unconstitutional. Rather, it finds that because the prayers actually offered were predominately Christian, often invoking the name of Jesus, the practice violated the Establishment Clause. It reasoned, “The proximity of prayer to official government business can create an environment in which the government prefers — or appears to prefer — particular sects or creeds at the expense of others.” Ante, at 347 (emphasis added). It rules accordingly that the Forsyth County Board of Commissioners cannot tolerate prayers at its meetings that so frequently invoke the name of Jesus. For the reasons that follow, I conclude that the Establishment Clause does not require that Forsyth County censor and restrict legislative prayers as the majority mandates.
II
In their complaint, Joyner and Blackmon focus on actual legislative invocations, not the policy governing the prayers. They' note that a vast majority of the prayers given have been Christian and have often invoked Jesus, and they argue, therefore, that this de facto pattern unconstitutionally advances Christianity over all other faiths.
*359 Forsyth County maintains that its policy for opening legislative sessions with prayer is neutral and inclusive and that the Board has not advanced one faith or religion in implementing the policy. It stresses that the Supreme Court has cautioned courts against parsing legislative prayers, as Joyner and Blackmon would have us do. Because there is no evidence that the County has used its policy to advance one religion over another, it maintains that, under Marsh, we must not analyze and judge the content of each prayer.
While Forsyth County does not deny that a majority of the prayers were offered by religious leaders of Christian denominations and that many of the prayers invoked the name of Jesus, it contends that the Establishment Clause does not require a legislative body to censor Jesus’ name or other names given by a religion to the Divine Being from invocations when the invocations are offered “before a meeting, in a designated public forum, by a diverse pool of visiting religious leaders who volunteer in response to an open, equal invitation.” It asserts that under Marsh, it can open sessions with prayer so long as the prayer opportunity has not been exploited to proselytize, to advance any one religion or faith, or to disparage any religion or faith, and that the content of such prayer “is not of concern to judges.”
Because the only evidence of the government advancing one religion was the fact that a majority of the prayers offered under the neutral and inclusive policy were Christian, I would find the evidence insufficient to support the conclusion that Forsyth County was advancing Christianity. Accordingly, I would affirm both the policy and the practice under it.
The Marsh decision, which stands as the applicable law, see Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276, 280-82 (4th Cir.2005), holds in a straightforward manner that legislative prayer to a Divine Being does not violate the Establishment Clause, which provides that “no law respecting an establishment of religion” be made. U.S. Const, amend. I. Based on a continuous historical practice of over 200 years and the original understanding of the Clause, the Supreme Court in Marsh stated:
We conclude that legislative prayer presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education, or tax exemptions for religious organizations.
Marsh, 463 U.S. at 791, 103 S.Ct. 3330 (internal citations omitted). Explaining, the Court stated:
In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an “establishment” of religion or a step toward establishment.
Id. at 792, 103 S.Ct. 3330.
To support his argument in Marsh that the Nebraska practice of opening legislative sessions with prayer was inappropriate, legislator Ernest Chambers pointed to the facts (1) “that a clergyman of only one denomination — Presbyterian—has been selected for 16 years”; (2) “that the chaplain is paid at public expense”; and (3) “that the prayers are in the Judeo-Christian tradition.” Marsh, 463 U.S. at 793, 103 S.Ct. 3330. Yet the Supreme Court found each of the three arguments made by legislator Chambers insufficient to render Nebraska’s practice unconstitutional. Rejecting Chambers’ first point, the Supreme Court observed that “[w]e cannot, any more than Members of the Congresses of *360 this century, perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church. To the contrary, the evidence indicates that [the clergyman] was reappointed because his performance and personal qualities were acceptable to the body appointing him.” Id. at 793, 103 S.Ct. 3330. The second point is not applicable here because Forsyth County did not pay the religious leaders. And finally, addressing the complaint that the prayers were in the JudeoChristian tradition, the Court stated what is applicable here:
The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.
Id. at 794-95, 103 S.Ct. 3330.
In sum, Marsh stands for the following principles of Establishment jurisprudence: (1) legislative prayer invoking Divine guidance for a legislative body is not an establishment of religion, 463 U.S. at 792, 103 S.Ct. 3330; (2) choosing the religious leader of a single denomination or religion to say the legislative prayer does not advance the beliefs of that leader’s religion over others, id. at 793, 103 S.Ct. 3330; (3) the fact that prayers are only from the JudeoChristian tradition is irrelevant, as “it is not for [courts] to embark on a sensitive evaluation or to parse the content of a particular prayer,” id. at 794-95, 103 S.Ct. 3330; and (4) legislative prayers may not proselytize, advance one religion over another, or disparage other religions or beliefs, id.
The majority reads Marsh as resting on the fact that the challenged prayers in that case were characterized as Judeo-Christian — a “non-sectarian ideal,” as the majority claims. Ante, at 347. To support this reading, it points to the Supreme Court’s dicta in County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), referring to the general religious references in Marsh. Allegheny’s dicta, however, do not govern legislative prayer cases. As this court noted, “Allegheny concerned religious holiday displays, referencing Marsh to confirm that Marsh did not apply in that context. Nothing in Allegheny suggests that it supplants Marsh in the area of legislative prayer.” Simpson, 404 F.3d at 281 n. 3. Using cases in other areas of Establishment Clause jurisprudence is especially dangerous, because “if Marsh means anything, it is that the Establishment Clause does not scrutinize legislative invocations with the same rigor that it appraises other religious activities.” Id. at 287.
In this case, Joyner and Blackmon raise arguments similar to those rejected in Marsh, and I would likewise reject them here.
Even as I recognize that the content of prayer remains mostly out of bounds for review by civil courts, I must note, in view of the majority’s emphasis on content, that the prayers in this case were largely generic petitions to a Divine Being to bless the legislative body and request that it be guided to act wisely and justly in the interest of the citizens. Indeed, it is remarkable how uniform in this regard the prayers were. Looking at some of the examples included in the complaint, the core requests of these prayers state:
• [S]o we ask tonight, Father, not only for You to be in our midst but for You to make available to each commissioner every resource they will need to be able to make the right decisions. [January 9, 2006]
*361 • We pray tonight, God, that You will guide these commissioners; and we pray, God, that You will strengthen the residents of this community. God, we pray that You would lead us and we pray that You will forever bless Forsyth County. [February 13, 2006]
• [W]e pray that these men and women in positions of authority, recognizing this, will take their positions seriously; that they will not use them to their own advantage, but the advantage of those they serve; that they would ask Your guidance and wisdom when making decisions; and that they would seek Your approval over the approval of men and women. [March 13, 2006]
• I pray for these commissioners tonight. I pray for all that will transpire in this meeting under Your authority; as the act of governing goes forth, that it would go forth with equity and with justice and with kindness and with wisdom. [March 27, 2006]
• Father, bless the things that are said tonight and the decisions that are made. [April 10, 2006]
• I’d ask that You’d give them great wisdom as they make decisions about our lives here in Forsyth County. [May. 8, 2006]
• We ask a special blessing upon our commissioners, Father. We ask that You would grant them with wisdom and understanding. [May 22, 2006]
• [W]e would ask You to give Your spirit to this meeting; and that these commissioners, they may seek justice for all and hear the voices of those in need. [June 26, 2006]
Most of the prayers did conclude with a Christian invocation, such as “in Jesus’ name we pray.”
The majority focuses on the prayer given on December 17, 2007, noting that it not only contained many references to Jesus Christ, but also references his divine role. This focus by the majority on the December 17 prayer, simply because of its description of Jesus’ role in Christianity, is precisely the content-inquiry that Marsh intended to foreclose. With such an inquiry, must we now determine how many times the name Jesus is spoken or what description of him is given? Surely because there is no standard for this inquiry, the majority seems to fall back on an evaluation of the “pressure to stand and bow” or on some form of “ostracism” felt by persons hearing the prayer. Ante, at 355. Yet in doing so, the majority relies on inappropriate grounds for finding a constitutional violation. The Establishment Clause does not protect against feelings of ostracism or marginalization. See Lee v. Weisman, 505 U.S. 577, 597, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (“We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation”). Rather, the Establishment Clause prevents governments from preferring one religion over, others. The majority’s focus on the December 17 prayer misdirects the necessary analysis.
To be sure, Joyner and Blackmon did, in their amended complaint, also focus on the December 17 prayer. But they did so to complain that any invocation of Jesus by the religious leaders speaking the prayers evidences a governmental preference -for Christian prayer. Under their complaint, the only question raised is whether the multiplicity of prayers said in the Christian tradition constitutes a government advancement of prayer, in violation of the Establishment Clause. The majority goes a step further than the plaintiffs’ complaint, noting not only the multiplicity of *362 references to Jesus but also the degree of sectarianism contained in particular prayers. This inquiry, distinguishing “hard” sectarianism from more “soft” sectarian references embroils the court in a standardless review of religious prayers.
In determining what it means to “advance” one religion or faith over others, the touchstone of the analysis should be whether the government has placed its imprimatur, deliberately or by implication, on any one faith or religion. See Marsh, 463 U.S. at 792-94, 103 S.Ct. 3330. More is necessary than to find that religious leaders selected to offer prayers were of one denomination. In Marsh, even though the Nebraska legislature had placed its imprimatur on the Presbyterian chaplain’s prayers inasmuch as the chaplain had been employed and paid by the legislature for 16 years, the Supreme Court concluded that the legislature had not advanced one religion, because the chaplain had given broad, inclusive prayers over those years. See Marsh, 463 U.S. at 793 n. 14, 103 S.Ct. 3330.
By contrast, however, in Wynne v. Town of Great Falls, South Carolina, 376 F.3d 292 (4th Cir.2004), the Town Council allowed only Christian prayers and refused to allow prayers associated with other religions. Id. at 295. In that circumstance, we held that the Council’s actions had affiliated the Council with one specific faith and demonstrated a preference for Christianity over other religions. Id. at 298-99. As we noted,
Here, the Town Council insisted upon invoking the name “Jesus Christ,” to the exclusion of deities associated with any other particular religious faith, at Town Council meetings in public prayers in which the Town’s citizens participated. Thus, the Town Council clearly “advance[d]” one faith, Christianity, in preference to others, in a manner decidedly inconsistent with Marsh.
Id. at 301; see also Simpson, 404 F.3d at 282 (characterizing Wynne as holding that “a Town Council’s practice explicitly advancing exclusively Christian themes to be unconstitutional”).
In Simpson, we addressed a prayer policy much like the one at issue here and affirmed its constitutionality. Chesterfield County had established a first-come, first-serve policy for religious leaders to give invocations. But the County did decline to allow a Wiccan to offer an invocational prayer. Even though the governmental entity exercised this limited control, we approved the County’s policy, based mostly on the general inelusiveness of its policy and its neutrality generally in selecting leaders to deliver prayers. While the holding in Simpson did not explicitly hinge on the fact that religious leaders honored the County’s request not to make sectarian references in prayers, that too was an indicator that the government was not using its power to select religious leaders to offer prayers to advance a particular religion. See 404 F.3d at 284.
When examining Forsyth County’s policy and practice in light of these cases, one can only conclude — indeed, more clearly than in Marsh and Simpson — that Forsyth County did not exploit the prayer opportunity to advance any one religion over others. Most importantly, nothing demonstrates the County’s preference for any particular faith or religion. Indeed, the evidence shows otherwise.
First, the County established a neutral and proactively inclusive policy of allowing all religious leaders in the County to deliver invocations at Board meetings. It is undisputed that both the County’s policy and its implementation treat religious leaders from all religions identically, and no congregation was excluded from the Coun *363 ty list. Indeed, the County proactively protected its inclusive policy by (1) inviting religious leaders from all congregations in the County to offer prayers; (2) allowing any congregation that was accidentally excluded from the list to be placed on the list simply by making a written request to the Clerk; and (3) insisting that no religious leader could offer a prayer in back-to-back meetings and, in any event, no more than two times a year.
Second, the Clerk scheduled the invocations on a first-come, first-serve basis, eliminating any opportunity for County officials to assert preferences.
Third, the County exercised no editorial control over the invocations beyond that required by Marsh. It did not even request to review prayers before religious leaders offered them.
And fourth, the County stated affirmatively to each religious leader that the prayer opportunity must not be “exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.”
None of the policies in the prior cases approving legislative prayer was as neutral and inclusive as the policy in Forsyth County, and there is no evidence that Forsyth County diverged from its policy in implementing it.
Joyner and Blackmon argue that Forsyth County has effectively advanced Christianity over other religions, even though the County’s policy was neutral and inclusive, because it turned out that most of the prayers offered were in fact Christian prayers. But this argument fails to recognize that the nature of the prayer was not determined by the County or by any policy the County adopted or implemented. The frequency of Christian prayers was not the wish or preference of Forsyth County, and the County in no way affirmed one faith over another. The frequency of Christian prayer was, rather, the product of demographics and the choices of the religious leaders who responded out of their own initiative to the County’s invitation. The County provided the most inclusive policy possible, but it could not control whether the population was religious and which denominations’ religious leaders chose to accept the County’s invitation to offer prayer. Moreover, there is no evidence to suggest that the Board attempted to game the demographics of Forsyth County by manipulating the list of religious leaders to ensure that only Christian prayer would be offered. The Board never even informed itself of the religious demographics of the County. Thus, sectarian references were the product of free choice and religious leaders’ composing their own invocations, without any control or review of content by the County.
This record does not support the conclusion that Forsyth County established religion or expressed a preference for or an affiliation with any particular religion any more than the record did in the school voucher cases. See Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). In Zelman, the Supreme Court upheld a school voucher program against an Establishment Clause challenge, stating that “where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause.” Id. at 652, 122 S.Ct. 2460; see also Good News Club v. Milford Central Sch., 533 U.S. 98, 114, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (“[A] significant factor in upholding governmen *364 tal programs in the face of Establishment Clause attack is their neutrality towards religion”). . In the same way, -Forsyth County does not advance one religion. It allows all religions to give legislative invocations and cautions those religious leaders not to exploit the opportunity for proselytization or disparagement.
The majority somehow concludes that because religious leaders offered sectarian prayers, Forsyth County’s policy and implementation of its policy were for that reason not neutral. It states, “Sectarian prayers must not serve as the gateway to citizen participation in the affairs of local government. To have them do so runs afoul of the promise of public neutrality among faiths that resides” in the Constitution. Ante, at 342-43. This argument actually backfires, though, requiring the County to police prayers, rather than to remain neutral. It also overlooks the real life fact that when Forsyth County calls for prayers from religious leaders under a neutral policy that is proactively inclusive, the prayers will reflect the religions of the religious leaders, not the preferences of the County.
The majority holds the position that “to shut our eyes to . patterns of sectarian prayer in public forums is to surrender the essence ■ of the Establishment Clause.” Ante, at 351 (emphasis added). Yet it also recognizes that “courts should not be in the business of policing prayers for the occasional sectarian reference — that carries things too far.” Id. (emphasis added). Yet its holding, focusing on the prayer of December 17, polices all prayer to exclude sectarian references. To be fair, the majority is probably more troubled with the frequency of Christian references than with the December 17 prayer.- It complains that the references to Jesus .were overwhelming, ante, at 351-52, representing “almost four-fifths of the prayers,” ante, at 353. This general content review, however, is also problematic and can lead to religious -hostility. The court is left with either directing the government to prohibit sectarian prayer altogether, a position that is not constitutionally required and is in’direct conflict with Pelphrey v. Cobb County, Ga., 547 F.3d 1263 (11th Cir.2008), or requiring legislative bodies to establishment sectarian quotas.
The majority’s position also entangles the legislative bodies in determining what form of prayer is sectarian or offensive to given members of the public. For example, adherents to the Hindu or Muslim religions could assert that they are offended by prayers in the Judeo-Christian tradition, which the majority has deemed to be nonsectarian and nonoffensive. But Forsyth County has appropriately remained neutral to these concerns, welcoming prayers from all religious congregations in the County.
Joyner and Blackmon’s proposed alternative of requiring a policy that mandates only nonsectarian prayer, which is now adopted by the majority, is problematic and not constitutionally required. Not only would it risk governmental intrusion into the practice of exercising religious beliefs, it would prohibit sectarian prayers where there is no clear definition of what constitutes a “sectarian” prayer. To be sure, a prayer that references Jesus is sectarian. But in Simpson, we labeled as nonsectarian - references to “Lord of [Ijords,” and “King of [k]ings.” See Simpson, 404 F.3d at 284. Yet, those phrases refer to Jesus in the New Testament. See Revelations, 19:15; see also Marsh, 463 U.S. at 823, 103 S.Ct. 3330 (Stevens, J., dissenting) (“The Court declines to ‘embark on a sensitive evaluation or to parse the 'content of a particular prayer.’ Perhaps it does so because it would be unable to explain away the clear *365 ly sectarian content of some of the prayers given by Nebraska’s chaplain” (internal citation omitted)). Because the way that an individual refers to God and surely the way the individual prays to God are largely informed and influenced by the individual’s religious beliefs, it would be virtually impossible to undertake the effort of separating those beliefs that are ecumenical from those that are sectarian. Such a task is “best left to theologians, not courts of law.” Pelphrey, 547 F.3d at 1267; see also id. at 1272 (“We would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions, and the [plaintiffs] have been opaque in explaining that standard. Even the [plaintiffs] cannot agree on which expressions are ‘sectarian’ ”). Moreover, such a determination is the very “sensitive evaluation” and “parsing” that the Supreme Court prohibited in Marsh. 463 U.S. at 795, 103 S.Ct. 3330.
In addition, we should not constitutionally mandate that any governmental body supervise the content of prayers given by private individuals. As the Supreme Court explained, when considering a high school and middle school graduation prayer:
We are asked to recognize the existence of a practice of nonsectarian prayer, prayer within the embrace of what is known as the Judeo-Christian tradition, prayer which is more acceptable than one which, for example, makes explicit references to the God of Israel, or to Jesus Christ, or to a patron saint.... If common ground can be defined which permits once conflicting faiths to express the shared conviction that there is an ethic and a morality which transcend human invention, the sense of community and purpose sought by all decent societies might be advanced. But though the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself.
The First Amendment’s Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same Clauses exist to protect religion from government interference.
Weisman, 505 U.S. at 589, 112 S.Ct. 2649 (striking down prayers at graduation of “primary and secondary school children,” for whom “the risk of compulsion is especially high,” but leaving open the legitimacy of such prayers in similar circumstances for “mature adults”).
The Establishment Clause surely does not require legislative bodies to undertake the impossible task of monitoring and prescribing appropriate legislative prayers for religious leaders to offer as invocations. And it does not require that legislative bodies demand that religious leaders only offer nonsectarian prayers. Yet the majority imposes these exact requirements, with all of its constitutionally suspicious problems.
In sum, the County’s policy for legislative prayer is totally neutral, proactively inclusive, and carefully implemented so that the County, in no manner, could be perceived as selecting, or expressing a preference for a particular religious leader, a particular religion or denomination, or a particular prayer. In this structure, which *366 was meticulously constructed to follow Supreme Court precedent, our intrusion is nothing short of a compromise of the County’s effort to maintain an open and neutral policy.
Ill
Prayer includes the articulation of words addressed to the Divine Being in accordance with the beliefs of the prayer-giver’s religion. Because how one should address the Divine Being and what one should say cannot be determined by a civil court of law, efforts to do so would inevitably place courts in the untenable role of regulating the content of religious expression.
And to interfere with a prayer-giver’s form of address during an invocation is no less intrusive. In the Jewish and Christian traditions, Moses asked God, when receiving the law, how he was to refer to God in relating the law to his people. God told Moses that he must say to the Israelites, “I am who I am” and therefore he must say, “I am has sent me to you.” ,God also told Moses to say to the Israelites, “YHWH [the sacred and unspeakable name of the Lord], the God of your ancestors, the God of Abraham, the God of Isaac, and the God of Jacob, has sent me to you.” God concluded, “This is my name forever, and this is my title for all generations.” Exodus 3:13-15. Christians call on the Divine Being with the names God the Father, God the Son (Jesus), and God the Holy Spirit. Muslims have 99 names for God, but Allah is the supreme appellation. Yet the majority opinion now directs all religious leaders to forsake these names to accommodate some “civil,” court-shaped religion.
Indeed, the majority demands prayers that do not mention Jesus — at least not “four-fifths” of the time; that are not in too close a “proximity” to official government business; that embrace a “non-sectarian ideal”; that do not create “patterns of sectarian prayer”; that do not “pressure one to stand and bow.” Such a position, however, fails to take prayer as the sacred dialogue between the Divine Being and the people, as determined by any given religion represented by the religious leaders of Forsyth County.
Indeed, Joyner and Blackmon’s complaint about being pressured to stand and bow during prayer — a complaint that the majority apparently accepts — is not a complaint against sectarian prayer or even against a government preference of a religion or denomination. It is an attack on prayer itself. It is not the sectarian nature of a prayer, or even its content, that creates the subtle coercive pressure of which the plaintiffs complain. It is the allowance of any prayer in the public forum and the respect for it shown by others that leads to this pressure. How the majority, in adopting the plaintiffs’ position, protects nonsectarian prayer but, at the same time, condemns the pressure caused by such prayer because the people stand and bow their heads suffers from its own inherent inconsistency.
Forsyth County has not picked any particular prayer — sectarian or not — nor has it favored any particular prayer. Its policy is to have a pluralistic celebration of prayer through which all in the County may solemnize the Board’s meetings while at the same time respecting each religion or denomination’s form of prayer. And Marsh supports this approach. It requires — in an effort to preserve respect for a mutual exercising of religions — that government not permit religious speech that proselytizes, advances one religion over another, or disparages other religions. And for that limited purpose, it directs that the content of legislative prayer be reviewed. But the review is limited, and is designed for the mutual protection of *367 the diverse prayers of a religiously pluralistic society, spoken in accordance with each religion.
Finally, I note that the majority’s logic in prohibiting only an invocation of Jesus during prayers in Forsyth County, but otherwise allowing other prayer content, escapes me. Prayer includes the invocation of the Divine Being according to the understanding of the religion, not the court. Would the majority thus preclude a Christian prayer invoking the Holy Spirit or Pax Christi or the King of kings? Would the majority deny a prayer invoking the God of Abraham, Isaac, and Jacob? Whatever name is spoken, it is spoken by the religious leader in accord with the leader’s religion to call on the Divine Being. Yet we now legislate, based on the imprecise notion of nonsectarianism, bowing to political correctness or universal inoffensiveness and censuring only what offended Joyner and Blackmon on December 17, 2007, without regard to the dangers of governmental censorship of religious expression.
I respectfully submit that we must maintain a sacred respect of each religion, and when a group of citizens comes together, as does the Forsyth County Board of Commissioners, and manifests that sacred respect — allowing the prayers of each to be spoken in the religion’s own voice — we must be glad to let it be. The ruling today intermeddles most subjectively without a religiously sensitive or constitutionally compelled standard. This surely cannot be a law for mutual accommodation, and it surely is not required by the Establishment Clause.